Good morning, Your Honors. May it please the Court. My name is Elizabeth Frost and I represent the Feldman plaintiffs in this litigation, which includes several individual Arizona voters, political party committees and campaigns. I'm also here today speaking on behalf of Bernie 2016 Inc., the intervener plaintiff below, with which we have filed a joint brief. I would like to reserve five minutes for rebuttal. On Election Day in November 2014, Victor Vasquez was in the hospital recovering from heart surgery, but he was determined to vote. He managed to convince the hospital to release him for just a few hours so that he could go and vote in person in Pima County, Arizona. He went first to the polling place closest to his house, but that was closed. He then went to another house where he'd voted in the past, but that was closed. He then remembered that earlier he'd received a mailing, a voter information sheet from the county, and he went home and he found it, and he went to the polling place listed on that sheet. When he left that polling place, he thought he had effectively voted. No one told him he was in the wrong precinct. No one told him he was voting a provisional ballot that wouldn't count. He only found out that he had been wholly disenfranchised after the election when there was a race that was close, and he got a phone call from an elections lawyer who was calling all of the voters who had been disenfranchised in accordance with Arizona's out of precinct ballot policy, the policy that's at issue in this appeal. Under that policy, Arizona disenfranchises eligible registered voters who vote in person in the county in which they are registered, but in a precinct other than the one to which they are assigned in that given election. Did Mr. Vasquez's ballot not have the address of his correct polling place, or was it erroneous? So Mr. Vasquez was actually on the permanent early voting list, so he didn't receive... He received some mailing from the county, exactly what it is, we aren't sure, which had a polling place listed on it, and that polling place was erroneous. But so he's... That means that he's on the permanent mail-in ballot, but because of his medical issue, he wasn't able to use the permanent mail-in ballot. Is that what happened to him? So what happened to him, actually, it's quite a story. What happened to him is, yes, because of his medical condition, he wasn't able to use it, and actually, when he got to the hospital, he handed his ballot to a nurse, and in the chaos of his medical emergency, that ballot got misplaced. So then he had to go vote in person, and at that point, obviously, he couldn't go back in time. Was there any evidence that, in the normal course of events, that the ballots that for people who were not on the permanent early mailing list had incorrect polling place identified, or otherwise, misinformation about where they had to go to vote? So there's no evidence in the record, Your Honor, that that is a consistent problem. There are a couple... Was there any evidence? Because the only misinformation I saw wasn't relating to polling place, it was the number of a initiative was 123 instead of 124, and the date was wrong. But was there anything about misinformation that was placed on the ballot about the polling place? No, Your Honor, there's no evidence in the record about that. There is evidence, however, that people have been getting misinformation in various different ways. So it's not always the same mistake, but there seems to be a lot of people who, because they got some mailing from the county, you know exactly what it was, were not sure, but they did have the wrong place on it. In the example of a voter who submitted... We submitted an affidavit below, Sherry Kelso, she actually called her county the week before the election and asked where she should vote, was given the wrong information. She also, like Mr. Vasquez, showed up at that location, voted a ballot. She was not told she was in the wrong place. She was not told the ballot wouldn't count, and she thought she effectively voted. Mr. Shapiro, another voter who submitted an affidavit below, looked up his polling place online and went to that polling place. He's a teacher, so he couldn't vote until the end of the day, and when he arrived at that polling place at 6.30, he was told he was in the wrong place. So he actually was told he was in the wrong place, which certainly is not a universal experience. But his polling place, his assigned polling place, was a 25 minute drive away. So at that point, he just couldn't get there before the 7 PM close of polls. He voted a provisional ballot, so that's how we know he was disenfranchised by the out of precinct ballot policy. But this is why... So in the 2012 presidential election, this policy disenfranchised nearly 11,000 eligible registered Arizona voters. That's probably a conservative number, because we have to believe that for the voters who are told they are in the wrong place, who are told the ballot they are casting is a fruitless exercise, some of them are just gonna say, you know what, I'm not gonna bother. And we have no way of knowing how many of those voters there are. So Arizona points out that they've been doing this for 40 years. What's new? Well, Your Honor, first of all, the fact that they've been disenfranchising voters for a long time does not make it constitutional or... No, but I ask, is there anything different? So I think that the question that you're getting at, and please tell me if I'm wrong, Your Honor, is why did we bring this when we did? And the answer... No, I'm actually looking for, are there any changed conditions? I understand your arguments about when you brought it and so forth. Okay. That's in the briefs, but are there any changed conditions over time? I mean, there are some changed conditions. I think that... And this is one of the impetuses for bringing it, frankly, when we did. And one of them is House Bill 2023, which my colleague was here before you talking about a week ago. And when the Arizona legislature enacted House Bill 2023, it eliminated a means by which many Arizona voters had voted absentee. So the natural expectation is that some of these voters are now gonna end up in person, and that a lot of these voters are gonna be the voters who were assisted by ballot collectors, who are gonna be exactly the kinds of voters that are gonna bear greater burdens. Another issue, frankly, is the presidential preference election that occurred in Maricopa County in March of this year. Maricopa County, as Your Honors are well aware, is the most populous Arizona county, and they ran that election under a vote center model where voters could vote anywhere. And now they're flipping back to a precinct model in the presidential election. So this highly publicized vote center election, it's very concerning that the out of precinct policy is gonna serve to disenfranchise even more voters who are gonna be confused about where it is that they can go to vote. Assuming, hypothetically, that you've established the first prong of the section two requirements, would you explain under the second prong how the burden, you've met your burden under the gangle factors and the totality of the circumstances of tying  Yes, Your Honor. The district court erroneously applied the second part of the section two voting rights test by applying an exceedingly narrow causal link analysis that is at odds with the section two's text and the precedent of the Supreme Court and this circuit. The district court found that plaintiffs had provided evidence demonstrating that minorities are more likely to rent, less likely to be homeowners, and have greater rates of residential mobility. The district court also appears to have credited the plaintiff's evidence about the continued effects that Arizona's long history of discrimination has had as reflected in disparities observed in employment, income, and education. And although it wasn't specifically mentioned in the opinion, I think I would also add, obviously, access to transportation. These disparities were not contested by defendants' experts, but the district court still found that the plaintiffs had not shown that racial discrimination is a substantial cause of these disparities. And the district court wrote, because, for example, plaintiffs cite no evidence of discrimination in housing. This court has consistently rejected narrow applications of the totality of the circumstances analysis at the causal link stage. This court actually went out of its way in Gomez v. City of Watsonville to make it clear that the critical stage is whether any discrimination has touched the right of members of the minority group to participate in the political process. And the court said, quoting the Senate report, the failure of plaintiff to establish any particular factor is not rebuttal evidence of no violation. Could I get back just for a moment? When you're talking about the two prongs, you're talking about the two prong test that's been adopted by the majority of the circuits that have looked at that, is that right? That's correct. So the first part is essentially the same as the text of the Voting Rights Act, and the second part is the totality of the circumstances and the Jingles factors. Am I understanding that correctly? Well, so just to be clear, the Jingles factors themselves, there's, I think, some confusion about this. The Jingles factors themselves are actually three particular factors that are normally applicable in the vote dilution context. They're part of the Senate factors, and they're part of the totality of the circumstances. And then the Senate factors, you know, are sort of the broader view. That's correct. We're talking about that test. I think that test is very consistent with what this court did, for example, in Gonzalez too. And frankly, in Farrakhan, right? Because in Farrakhan, you have the disparity shown, but and then you move over to the causal link, and that's where... There we were looking at history as well, the felon disenfranchisement. But just getting back, in trying to parse through the language of the text of the Act, I was trying to understand which sorts of prerequisites to voting would not fall under the analysis that you're providing. So what the district court suggested was, and some other cases have said, any prerequisite to voting, including registration or photo ID, other prerequisites that have been upheld, could fall more heavily on people with socioeconomic disadvantages. But that doesn't mean that those practices, those prerequisites, all fall by the wayside. It has to lessen the opportunity of the members of the electorate to participate, and it has to be involved with racial discrimination against that class. So the analysis that you're giving for the requirement here is actually just to go to the correct precinct. So it's a prerequisite for voting that's been around for a long time. Why doesn't your analysis then work to eliminate any prerequisite to voting? Why wouldn't it be equally applicable, and how would we draw a principle distinction? Well, first of all, Your Honor, as this Court has recognized, Section 2 is actually meant to address exactly these kinds of situations that are not per se violations, right? And if one court finds one state's law, in the totality of the circumstances, operates to disparately disenfranchise minority voters, and that's linked to, I think the language in Farrakhan was, amplifies and accommodates. So where's the racial discrimination here? You have socioeconomic differences, but why wouldn't a requirement that you register to vote, if there was evidence that was more difficult because of socioeconomic factors for minority communities to register, or they don't have cars, so they don't go to the DMV and do the motor voter registration. Why wouldn't that registration requirement also be invalidated under your theory? I think every Section 2 analysis is focused on the particular burdens at issue, right? So in this case... But could you address my hypothetical, please? Well, I wouldn't, unfortunately, I can't address... I think the answer would be, if it was demonstrative, like... So if the registration, if there was evidence that more, that fewer people in a minority community could register, then, or that the socioeconomic factors made it more difficult for them to register, would the requirement that people register before they vote also violate the Voting Rights Act? And if not, why not? So if you first have the racial disparity that you see here... So let's say it's in Arizona. Let's just say it's the same history. It's Arizona. They have a registration requirement like every other state. Why wouldn't that fall? So I guess this is where I'm sorry, and it's not that I'm trying to avoid answering the questions, is that I'm trying to break it into the two parts, because I think that's the way that courts have handled it. I think that's consistent with the way this court has handled it. Here, if what you had was a specific registration requirement, right? That it's a requirement that you have to register before you can vote. So it's a specific registration requirement. It's a prerequisite to voting. You must register. Right. And if what you saw is you saw that consistently voters were... Let me back up. I think this law is unique because it disenfranchises voters, period. Well, if you don't register, you can't vote. You show up to the poll, your name's not on the list, you can't vote. You're disenfranchised exactly the same way. If you had a registration law... I'll tell you, I think most of the time, no. If you had a registration law that said you can only register between the hours of 10 and 6... Well, that's not what the case we have here. This is just a... You have to show up at the right polling place, right? The right precinct. Well, I think that what you have here is you have the totality of the circumstances which make that particularly difficult, which is demonstrated election after election after election. If you're Hispanic, you are twice as likely to be disenfranchised this way. If you're Native American, I think the numbers are higher. If you're African American, you are also much more likely to be disenfranchised this way. And if there was the same evidence about a registration requirement, that it's more difficult, so fewer minority voters or potential voters register than non-minorities because of socioeconomic factors? I think you wouldn't... You wouldn't be able to link it in the same way that you can link this. Right? It's the same socioeconomic factors. Yeah. They don't have cars, they don't go to the DMV, so they don't have the advantage of the motor voter registration. It's more difficult for them to get to the places where they could register. They don't have education. All of the same factors you've identified here, why wouldn't they be equally applicable? Because in the outer precinct context, those factors come into play in a very narrow period of time. They come into play on election day. So it is clear that the link is very direct. Whereas when you're talking about a broader registration period, and frankly, a court in Wisconsin found that when you narrowed that registration period, that did itself... That was itself a violation of the VRA. But here you are talking about something that happens in a very short period of time. The distinction is, if it's a short period of time, it might violate section two. But if there's a longer period of time, it doesn't. Is that your principle distinction? I think there would be more accessibility, Your Honor. And I see that I'm past my five minutes already. I'm sorry for drawing you out. No, I appreciate it. Thank you, counsel. We're from the state. Good morning, Your Honor. May it please the court. I'm Karen Hartman-Tayez from the Arizona Attorney General's Office, here representing the state defendants, the Arizona Secretary of State's office, and Secretary of State Michelle Reagan, who are the only two state defendants who are named in this particular claim regarding out of precinct voting. I'll also be speaking on behalf of the Maricopa County defendants. Although counsel for the county defendants, Colleen Connor, is here in case the court has specific questions for her. I'll be splitting my time with counsel for the intervener defendants, Brett Johnson. I understand you'll be taking 13 and they'll take 7? Yes, Your Honor, that's correct. If it is okay with the court, I would actually like to take things out of order a bit and talk first about the balance of hardships and the public interest here. In the briefing, the plaintiffs repeatedly assert that it would be simple for the state to count out of precinct ballots. And that assertion is just flat wrong, especially at this late date. Today is 13 days before the general election. The record in the trial court contains testimony from two counties regarding the time consuming process that it would take to count ballots. If you look at the record evidence, the low estimate there is 15 minutes. Could you, to that end, and I've read your brief and the testimony, could you take me through, if you could, how provisional ballots are counted and handled? And if you don't know, maybe your colleague could. Just not in the future, but right now. Right. Would you like to know specifically about the out of precinct ballots or just all provisional ballots? Just provisional. Let's restrict it to out of precinct ballots. Thank you. Actually, if you don't mind, I'll talk about it because if it's determined that they're out of precinct, they aren't counted. So there's a little bit more to it. I just want to know about the process. Right. So if I were to walk into a polling place and for some reason I don't appear on the on the rolls, I have the wrong, I don't have sufficient identification, I received an early ballot and it's marked there that I got an early ballot, I would have to vote a provisional ballot. There's a form that's filled out by the poll worker that indicates the reason why. And this is, let me be clear, this is for Maricopa, this is sort of specific to Maricopa County. So once a provisional ballot is taken, what does the person at the poll do with it? Okay. It's, they're put into envelopes with the, they have a copy of the form and I believe it's like a triplicate form and the other copy goes somewhere else. They get put in a tub. That tub goes back to the counting center after the election. And back at the counting center, the provisional ballot is loaded into a computer. They're compared with the registration records and the person doing that comparison makes a determination as to whether that vote should be counted or not and sort of marks yes or no. So there was a reference to a duplication board. What is that? Sure. Okay. So the duplication process that presently exists is there mostly for damaged ballots. So you fill out your early ballot at home, you're drinking coffee, you spill your coffee on the ballot and the machine can't read it. So they, if that happens, they get a fresh ballot that matches the ballot that the voter filled out. Two people from different political parties are there and they literally mark, they look at the presidential race and they make the same mark. And you have two people there to make sure that they do it right. Just one little thing. In Arizona, in three of the counties, the three largest counties, superior court judges are, they're appointed and then retained. So on the Maricopa County ballot, there are about 50 judges on the backside of it with yes or no. You make a mistake on one of those, you have to start over. But so that's the duplication process. Okay. So back to the computer. So the computer matches the addresses. Right. Or a person looks at it, makes a determination as to whether that vote should be counted or not and... So they physically just look at the address. The address or the... If there's a registration record, whether they voted an early ballot. And then if it were an out of precinct thing and it were a matter of duplication, they would have to find the correct ballot for that person's... The precinct they should have voted in and have someone do that duplication process, but only transferring over the races that appear on both ballots. Another twist in there is that there is candidate rotation on the ballots, so they're not always in the same spot. So it really is a time consuming process. Yeah. So, but back to all provisional ballots, once they make the yes or no determination, they pull the tub from that precinct and there are barcodes. And so they can scan and they sort of yes, no, yes, no, put them in piles, take all the yeses, take them out of the pack, and send them through the high volume counting machines. So that is how the process works. And as I've mentioned, the duplication process is time consuming. It would take hundreds, if not thousands of hours, depending on how many provisional ballots. Hopefully, there won't be as many out of precinct provisional ballots as there have been in the past. There have been some changes in administration with using e poll books and things like that in Maricopa County that drastically reduced the number of out of precinct provisionals in the primary in August. And hopefully, some further changes will make that even better. But it still would be an extremely time consuming process. But I think even more importantly, sample ballots with instructions about only voting at where the polling place is for each voter and that if they voted the wrong polling place, their ballot won't be counted. Those have to go out on Friday, 11 days before the election under Arizona law. So those are printed and ready to go. If there's a change now, that's a problem. The poll workers for Maricopa County's 724 precincts have been through training. There's written materials that explain that voters have to vote in the precinct to which they're assigned or their ballot won't be counted. And the training has been given to that end. There are 11 other counties in Arizona who are not parties to this lawsuit, who haven't had the opportunity to weigh in on any sort of unique issues in their particular county. These are more rural counties. They have different issues than the urban counties. And also, because they aren't parties, they can't be bound by an order from this court. The Secretary of State has authority to make rules through its election procedures manual, but that is a process that involves input from the counties, approval by the Attorney General and the Governor. Having that ballot in less than two weeks. Could you explain to me why it would be, what kind of a burden it would be simply to count the head of the ballot, the presidential vote of the out-of-precinct ballots? Your Honor, it... That's all they want. Right, right. It would be... The duplication process would have to happen. The computers, the election system, the counting equipment... The out-of-precinct votes would be put in the tub. Take the tub and count the ballots. I'm sorry, Your Honor. They would have to, still have to do the duplication process. They can't send the ballots through the machine and say, only count President. They have to make a new ballot that doesn't record votes for the other races. Why can't they send the ballot through the machine? Because the machine only counts the ballot if the ballot is one for that precinct? It has to count everything that's on the ballot. Right, but you could probably take a separate run if you had a different computer and say, look, here are all the ones that are out-of-precinct and you run it through, you count them and you just say, we can't add in any of these other required in-precinct ballots. We're only going to count these races. I mean, that's mechanically possible. You just have to use a different computer so it's not, I mean, the same software. I think it would require reprogramming of software and that... Well, not necessarily. If you had the same software, different computer, so they're physically separated, it would do the counting, but then you would not over count in the races for which they're not qualified. Your Honor, I think maybe that's theoretically possible, but I actually think that the existing systems owned by the county, at least Maricopa County right now, couldn't do that without a full reprogramming of software and that then runs into violating state and federal law regarding the sort of testing and approval of counting software. Judge Acute had a question about whether looking at those manually is less efficient than doing a duplicate ballot and putting it through the software. Is that correct? Yes, you know, and I don't know if Arizona law even would permit a manual count. There are provisions in law for sort of hand counting as a check and it's... But not for doing it in person. So under Arizona law, you're telling the duplicates of the out-of-precinct ballots that did not include the precinct-specific votes is the way that Arizona would have to fulfill this injunction and that it would be time-consuming. Yes, your Honor. When you do a recount and you're canvassing, do you do that manually or do you do it through the electronic system? The recount is done through the electronic system for the primary. Because if the race is close enough, the state law requires a recount and it's done. And as it did in Congressional District 5, the Republican primary. Correct. So I think we've covered this pretty much about sort of how we, the only way that we can think of that Arizona would be able to count out-of-precinct ballots. The plaintiffs argue that it shouldn't be a problem because other states do it. But the states that do it have had the systems in place. And Arizona does not presently have a system in place. And we're now essentially running into exactly what the Supreme Court warned about in Purcell. We are right up against the election. We would be changing the rules in the middle of the election. Early voting started on October 12th. Maricopa County has almost 500,000 ballots that have already been cast. It's just... Purcell would not be affected by this. Right. Now this is, this is a postal, it's slightly different. I take your point. But it's slightly different than anything that would have to happen pre-election. In other words, this is about counting votes after the election. Your Honor, to some extent it is. But it is also about how the poll workers are trained. And that's exactly what the issue is. Why does it make any difference? Because they're gonna take the ballots and put them in the tub anyway. The question is what happens at the center once the ballots in the tub are transmitted to the center, right? I mean, you could have bad training in what they're told. Because, because they're not, you know, the votes aren't gonna count for, if they're out of precinct, their votes aren't gonna count for those non statewide races. Your Honor, I think it would be important to inform voters of that. That, that only some of their ballot will be counted. Because that's, that's one of the things here. The plaintiffs don't seem to have any concern about the fact that their proposed solution does involve some disenfranchisement. There are all those down ballot races. Some of the, you know, those local issues are really the ones that affect one's day-to-day life even, even more than the national. I agree with that. But that's, I mean, that doesn't, you know, you don't want them to vote in the wrong precinct anyway. Nobody wants to vote in the wrong precinct. I'm not quite sure what counting, if they go to the wrong precinct, despite your warnings now, and they're qualified to vote, why that would make a difference pre-election? Well, I think that, in terms of disenfranchisement. Your Honor, because there would, there would still be partial disenfranchisement, and we'd, and you'd like to avoid that. So, what about the time frames for doing the county under Arizona law? You referenced that you had a short time frame, and it would be possible to do it within that time frame? Or would, would it require violating those state statutes? Well, Your Honor, that is something that the, that the district court found. I believe that it's, and perhaps counsel for the county can correct me if I'm wrong, but I think it's, the counties have ten days, I think, to complete the count and, and provide the canvas to the Secretary of State. I think that the sort of end days for the Secretary of State to issue the official canvas. Okay. And I see that I'm, I've gone over my time, but I will now. Thank you, counsel. Put seven minutes on, because we want to give you your full time. I see your colleague is here. Would you introduce her for the record, too? Yes, absolutely, Your Honor. Good morning. May it please the court, Brett Johnson and Sarah Agnew, who argued last week, on behalf of the Arizona Republican Party, former Councilman Bill Gates, Representative Tony Romero, Councilwoman Suzanne Clapp, Senator Lesko. And I think it's important that I say those individuals, because it goes to the last question that Judge Thomas, you, you asked in regard to the balance of hardships and, and whether or not there's going to be an impact. And those candidates right now, with a significantly lower campaign budget than what is two plaintiffs on the other side, are trying to run very local races. And so if there is the effort from this court order, which would be publicized, that you could go vote wherever you want, at, as your convenience, those candidates are going to have to spend significant efforts making sure that their neighbors and the people in the precincts get to the correct polling place to ensure that the local issues are mattered. And that's what the Arizona law, what has been in place for over 40 years, is essential. We're talking about school bond issues, we're talking about local candidate, candidates. So those shifts of resources is completely moot in the conversation from the plaintiff's side. But as I understand what the plaintiffs want, they only want the top line counted. State and, and, and national election. Your candidates, you're talking about local city council, they wouldn't be counted anyway. That, that, you're absolutely right, your honor. But if there is the information, if there is the inclination, I can go to any voting place because I'm just going to go vote. And that's how the message is there, that I can go to any polling precinct. Because that's how the message will get out in the social media soundbite. That is going to have a serious disenfranchisement on the local candidates, because the local candidates are now going to have to spend time to ensure that those elect, or those voters, get to the correct voting place. Are you saying it would be a disincentive for individuals to go to the correct precinct so they would miss out on voting the more local races? Is that what you're saying? I completely agree, your honor, and that's exactly correct. And because the Supreme Court... Where's that on the record? And I don't mean to be, you know, to downplay the effect you're talking about, because I, obviously you're in the middle of election, these are practical consequences. But do we have any, do we have anything in the record that suggests that would occur? Um, no, your honor, we don't. Actually, that's not true, your honor. I apologize. We do have declarations from the individual intervener defendants who talk about their experience as local candidates and, and the impact. So that's not true, your honor. We do have evidence in the record that is not countered, by the way. And I'm not discounting what you said today, I'm just curious what... Absolutely, your honor. So, and these are, these are longtime local representatives. These are the people that are, you know, going to the school board meetings. These are the people going to the local meetings trying to drum up support for their local candidates. But in regard to, I wanted to give you a little bit more in regard to the software issue. Unfortunately, or fortunately, Arizona law requires a 90-day prior to an election testing mechanism for the software. And my understanding is, is that when that software is changed, it has to go back through that testing process between with both the Secretary of State's office and the individual county offices as to those machines. So it's not going to be as easy as, let's just put it into a different computer. Well, you wouldn't change the software, was my point. I mean, obviously, you have to get the software approved. In other words, you could use the same software or a different ballot method. But I don't want to get into the technicalities, having been through a few recounts. I know this, but go ahead. Yes, your honor. But you bring up great, great issues, though. Because everything that has been talked about, the hypotheticals that you presented, are the exact issues that the district court or another judge is going to have to deal with. They don't lay out a remedy other than count the top two. What they said before Judge Reyes, the learning counsel on the other side, said we trust the Secretary of State to figure out a process and the counties to figure out a process. With two weeks left after this entire process is done, after there's been input from the counties, the Secretary of State's office, the Governor's office, and the Attorney General's office, to all make this work in two weeks, just imagine the Pandora box is going to be opened when it's not exactly as either the plaintiffs want it or another interested party wants how that process is going to work. They're going to run right back into court and say that is not in our interest. So I think that we do, the balance of the hardships significantly impacts not just the state, but the individual candidates. Judge Ikuda, in regard to your causal question, I think that the analysis is exactly right, and Judge Reyes got it right, in that it's such an attenuated causation factor to stealing something from from tort. That basically you have a history of employment, employment income, education, and transportation, which then leads to lower home ownership, which then leads to greater confusion caused by factors that are not at issue in this court, which then leads to the voter not being able to find the correct polling place, despite all of the evidence that they don't want you to hear about, which is Clean Elections Commission, the Arizona Independent Redistricting Commission, the amount of marketing and efforts by both the parties and the government in making sure that people know where to vote, and then they get to the final issue, which is what they're asking for relief for, which is the OOP ballot should be counted. Well, as Judge Reyes said, the OOP ballot should be counted immediately to the bottom issue without addressing any of those causal links in between. So that's why Judge Reyes correctly determined, and it is a different standard here. These are factual issues that the judge had to weigh to come to the determination. So that is a significant issue that nobody's talked about yet, but it's an abuse of discretion of how he weighed the evidence and how he compared the different experts. Of note, he took the plaintiff's experts' facts and then applied them using a different scenario because he believed, the judge believed, that it should have been a greater scope of sampling. And in any kind of statistics, the sampling matters. And that was completely within the discretion of the judge, the district court, to take that information and come to the solution or come to the resolution. Are you still pressing your Section 702 objection as to the method used by Dr. Rodden? And if so, why? Absolutely, Your Honor. The main issue for Dr. Rodden is two issues. Number one, there is no margin of error. As the district, or as this court determined in Gonzales on an en banc ruling, the importance of the sampling and of the data was paramount. And that was left to the district court to determine in that case. It was accepted by the en banc panel. So without that margin of error, we do have... But the district court here accepted it. He did, Your Honor, but he also put a footnote in that basically said that these issues were to be decided upon the district court and that we objected to the finding of that. But for purposes of this order, for purposes of preliminary injunction hearing, he did raise, he did allow that information and accepted it. So again, Your Honor, Judge Bea, he gave review of the entirety of the plaintiff's case. He also did a review of the evidence presented by the defendants. And underneath a totality of circumstances test, he weighed all of those factors and came to the correct conclusion. And because of that alone, that is basically what the issue is. But yes, Your Honor, I wanted to make sure we are still that once this finally gets to trial, and I know that they talk about VC quite often. VC, 100,000 records for review. A trial that lasted nine days over several years. This type of record, this close to the election, and everybody trying to scurry to try to make sure that there's some sort of resolution to this case causes significant errors. I see that my time is almost up, but so I would like to end on just one note, Your Honor. And I would like to end it quoting from the Supreme Court in verdict at 433, and recently reiterated by the Sixth Circuit in Houston, and as referenced by the district court here. The right to vote in any manner is not absolute. Common sense, as well as constitutional law, compels the conclusion that there must be a substantial regulation of elections if they are to be fair and honest, and if some sort of chaos is to accompany the democratic process. Your Honors, allowing plaintiffs relief at this late stage, when no specific laws are at issue, will lead us down the road of chaos. Thank you for your time. Thank you very much. We'll hear rebuttal. Ms. Frost, can I engage your attention for just a second? I was reading with great interest your brief, page 11, summary of the argument. You argue there in the summary that the court also erred as a matter of fact, and going down a little bit farther, it ignored overwhelming factual evidence of a connection between racial discrimination historically, and the injuries involved here. If I accept what you've said, don't you lose? I think it's an also as a matter of fact. So because the court erred on, frankly, I think with... Are you abandoning that claim so I don't have to look at the record of fact? You know what, Your Honor? I will say that yes. I just like to address a few things that opposing counsel said. First of all, it's not true that an injunction would not bind the counties. Under federal rule of civil procedure 65D2, it binds all persons who are in active concert or participation with the parties, and those are obviously the counties here. The proper defendant in a constitutional challenge like this is the Secretary of State. As for the administrative burdens, the time to raise these concerns was when the district court asked the defendants, how late can I rule? That was the time to say we need it 90 days out. Rather than lay out those burdens then, they said, Your Honor, we don't need this until November. We're actually still not in November. It's also not true that the counties would have to change the information out to the voters. This is a fail stop. It is not true that we don't want people to vote their whole ballots and go to the right precincts. We absolutely want people to vote their whole ballots and go to their precincts. That matters enormously to us. This is for those voters who end up in the wrong precincts and cannot make that correction. It's also important to recognize... How do you respond to Mr. Johnson's point that if we were to order your relief, that misinformation would occur in the sense that voters might believe they could vote out of precinct and have their votes counted? Voters already believe that. They're already showing up at precincts thinking that they can vote. So it's not really a shift of the status quo at all. I'd like to just say one final thing, and that is that there's some concern about whether or not they'd be able to finish their canvas in time. If you look at the August primary, there, the council for the Republican Party brought a claim, trying to get the Superior Court judge to order that several of these ballots be counted. And that hearing was held the day before the canvas was scheduled to election, where you have this many more voters. Thank you, Your Honor. Thank you, counsel. Thank you all for your arguments and briefing this morning. The case just heard will be submitted for decision and will be in recess.
judges: Thomas, Bea, Ikuta